Filed 7/18/17 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAN DIEGO COUNTY WATER AUTHORITY,<br><br>    Plaintiff and Appellant,<br><br>v.<br><br>METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al.,<br><br>    Defendants and Appellants. | A146901, A148266<br><br>(City & County of San Francisco Super. Ct. Nos. CFP-10-510830, CFP-12-512466)<br><br>ORDER MODIFYING OPINION AND DENYING REHEARING; NO CHANGE IN JUDGMENT |

THE COURT:

It is ordered that the opinion filed herein on June 21, 2017, be modified as follows:

On page 30, at the end of footnote 16, add the following sentence:

The legality of the water stewardship fee as a component of Metropolitan's full-service water rate is not at issue here and we express no opinion on the matter.

There is no change in the judgment.

The petition for rehearing is denied.

Date: _____ P.J.

Trial court:                              San Francisco County Superior Court

Trial judge:                             Honorable Richard A. Kramer
                                         Curtis E.A. Karnow


Counsel for Plaintiff and Appellant      QUINN EMANUEL URQUHART & SULLIVAN, LLP
Metropolitan Water District of           John B. Quinn
Southern California:                      Eric J. Emanuel
                                         Valerie Roddy

                                         MORGAN LEWIS & BOCKIUS LLP
                                         Colin C. West
                                         Thomas S. Hixson

                                         QUINN EMANUEL URQUHART & SULLIVAN, LLP
                                         Kathleen M. Sullivan

                                         THE METROPOLITAN WATER DISTRICT OF
                                         SOUTHERN CALIFORNIA
                                         Marcia Scully
                                         Heather C. Beatty
                                         Joseph Vanderhorst
                                         John D. Schlotterbeck

The City of Los Angeles acting by        Michael N. Feuer, City Attorney
and through the Los Angeles              Joseph A. Brajevich, General Counsel
Department of Water and Power:           Julie C. Riley, Deputy City
                                         Melanie Tory, Deputy City Attorney

                                         MEYERS, NAVE, RIBACK, SILVER & WILSON
                                         Amrit S. Kulkarni
                                         Gregory J. Newmark

Municipal Water District of Orange       ALESHIRE & WYNDER, LLP
County:                                  Stephen R. Onstot

City of Torrance:                        John L. Fellows III, CITY ATTORNEY
                                         Patrick Q. Sullivan, ASSISTANT CITY ATTORNEY

Las Virgenes Municipal Water District, Eastern Municipal Water District, Western Municipal Water District, Foothill Municipal Water District, and West Basin Municipal Water District:

LEMIEUX & O'NEILL
Steven P. O'Neill
Michael Silander

Three Valleys Municipal Water District:

BRUNICK, MCELHANEY & KENNEDY
Steven M. Kennedy

Counsel for amicus curiae Upper San Gabriel Valley Municipal Water District:

LEMIEUX & O'NEILL
Steven P. O'Neill

Counsel for Defendants and Appellants San Diego County Water Authority:

KEKER, VAN NEST & Peters LLP
John W. Keker
Daniel Purcell
Dan Jackson
Warren A. Braunig

SAN DIEGO COUNTY WATER AUTHORITY
Mark J. Hattam

A146901, A148266

3

Filed 6/21/17 (unmodified version)
**CERTIFIED FOR PUBLICATION**

THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| SAN DIEGO COUNTY WATER AUTHORITY,<br><br>        Plaintiff and Appellant,<br><br>v.<br><br>METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA et al.,<br><br>        Defendants and Appellants. | A146901, A148266<br><br>(City & County of San Francisco Super. Ct. Nos. CFP-10-510830, CFP-12-512466) |

Metropolitan Water District of Southern California (Metropolitan) appeals a judgment holding that the rate it charges for transporting water, or "wheeling," violates numerous provisions of law and awarding the San Diego County Water Authority (Water Authority) substantial damages for having charged that rate in breach of a water exchange agreement between the two agencies. The Water Authority cross-appeals, disputing the trial court's decision upholding a provision in water conservation program contracts between the two parties that penalizes it for participating in litigation or supporting legislation to challenge or modify Metropolitan's existing rate structure.

The central issue in dispute is one of cost allocation: May the charge Metropolitan imposes for wheeling water purchased from a third party include an amount calculated to recover Metropolitan's allocable transportation costs over the California Aqueduct, part of the State Water Project, or must the charge be limited to costs allocable to transportation costs over those parts of its system that it owns and utilizes in the particular transaction? In *Metropolitan Water Dist. v. Imperial Irrigation Dist.* (2000) 80 Cal.App.4th 1403 (*Imperial Irrigation*) it was held, and the parties do not dispute, that the

1

"wheeling statutes" (Wat. Code, § 1810 et seq.) do not as a matter of law prohibit the allocation of system-wide transportation costs to reasonable wheeling charges, so that wheeling rates need not be limited to the marginal cost of transporting water over the facilities used in a particular transaction. The trial court here held that although Metropolitan is required to pay its pro rata share of the costs of maintaining the California Aqueduct, these costs may not be considered in calculating Metropolitan's wheeling charges, essentially because Metropolitan does not own the aqueduct. We conclude this was error. The inclusion of Metropolitan's system-wide transportation costs, including transportation charges paid to the State Water Project, in the calculation of its wheeling rate does not, as the trial court held, violate the wheeling statutes, Proposition 26 (Cal. Const., art. XIIIC, § 1, subd. (e)), Government Code section 54999.7, subdivision (a), the common law, or the terms of the parties' exchange agreement.[1] We do agree with the trial court that the allocation of "water stewardship" charges to the wheeling rate is improper and that the Water Authority is entitled to recover the overcharges that resulted from inclusion of those charges in the rate charged by Metropolitan.

With respect to the cross-complaint, we conclude that the trial court correctly held that the condition in the water conservation program contracts penalizing the Water Authority for exercising its right to seek judicial relief from the imposition of unlawful rates is an unconstitutional condition, but that the court erred in holding that the Water Authority lacks standing to challenge that condition.

Therefore, it is necessary to remand the matter to the trial court for further proceedings consistent with this opinion.

---

[1] In the trial court, the Water Authority also contended that the rate violates parts of Proposition 13 (Gov. Code, §§ 50075, 50076) and the Metropolitan Water District Act (Wat. Code Appen., § 109-134 [all citations to Water Code Appendix section are to uncodified acts reprinted at 72B West's Annotated Water Code Appendix]). The trial court deemed these provisions inapplicable and the Water Authority does not contest that conclusion on appeal.

## I. Factual Background[2]

Metropolitan imports water from Northern California and the Colorado River along hundreds of miles of aqueducts and delivers it to a voluntary collective of public agencies, including the Water Authority. The Water Authority, in turn, delivers the water to retail water agencies serving households and businesses in San Diego County. To put the present controversy between the two agencies in proper perspective, it is necessary to begin with some history and an explanation of the manner in which the fixing of wholesale water rates has evolved.

A. California's Water Supply

"The history of California water development and distribution is a story of supply and demand" marked by an "uneven distribution of water resources" by region and season. (*United States v. State Water Resources Control Bd.* (1986) 182 Cal.App.3d 82, 98.) Regionally, most of California's rain and snow falls in the north while most of the demand arises in the south. (*Ibid.*) There is also an unequal distribution by season as precipitation occurs in the winter while demand is highest in the hot and dry summer months. (*Ibid.*) Precipitation also varies widely year to year. California has addressed its variable and uneven distribution of water resources by establishing an extensive water supply system to store and move water where and when it is needed. (Assoc. of Cal. Water Agencies, California's Water: California Water Systems <http://www.acwa.com/content/california-water-series/californias-water-california-water-systems> [as of June 21, 2017].) Over 1,000 reservoirs, "dozens of local and regional water conveyance systems" and "[s]even major systems of aqueducts and associated infrastructure exist today to capture and deliver water within the state." (*Ibid.*) This water supply system is managed by a network of agencies on federal, state, regional and local levels.

---

[2] The record on appeal is voluminous with an administrative record of approximately 30,000 pages and appendices exceeding 10,000 pages. We provide a summary of the pertinent facts.

B. Metropolitan

Metropolitan was established by the California Legislature in 1928. (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1415.) "Its mission is to combine the financial resources of cities and communities in Southern California and to bring supplemental water to the area." (*Ibid.*) Initially, Metropolitan was formed "to construct and operate the 242-mile Colorado River Aqueduct" to transport Colorado River water to the area. (The Metropolitan Water Dist. of So. Cal., Who We Are, MWD ACT & Code <http://www.mwdh2o.com/WhoWeAre/MWDAct/Pages/default.aspx> [as of June 21, 2017].) "Concurrent with the enactment of the Metropolitan Act, the U.S. Congress passed the Boulder Canyon Project Act, authorizing construction of Hoover Dam, which provided power to pump water to Southern California." (*Ibid.*) Today, Metropolitan imports water from two principal sources, the Colorado River, using its Colorado River Aqueduct, and Northern California via the state-owned California Aqueduct.

Metropolitan delivers water to a voluntary collective of "26 member public agencies — 14 cities, 11 municipal water districts, [and] one county water authority," the San Diego County Water Authority. (The Metropolitan Water District of So. Cal., Who We Are, Overview & Mission <http://www.mwdh2o.com/WhoWeAre/Mission/Pages /default.aspx> [as of June 21, 2017].) Metropolitan's member agencies provide "water to more than 19 million people in Los Angeles, Orange, Riverside, San Bernardino, San Diego and Ventura counties." (*Ibid.*) "Metropolitan currently delivers an average of 1.5 billion gallons of water per day to a 5,200-square-mile service area." (*Ibid.*)

The board of directors "sets policy and guides the actions" of Metropolitan. (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1416.) The member agencies govern Metropolitan through their representatives on its board, with each agency appointing its own representatives. (See Wat. Code Appen., §§ 109-50, 109-51, 109-55.) Representation is proportional based on the taxable property value in each member agency's service area, although each agency is entitled to a minimum of one board seat. (Wat. Code Appen., §§ 109-51, 109-52.) The City of Los Angeles has the most directors

4

with the Water Authority close behind. (*Metropolitan Water Dist., supra,* at pp. 1415-1416.)

C. The Water Authority

As noted, the Water Authority is one of Metropolitan's member agencies. It "is an independent public agency that serves as San Diego County's regional water wholesaler. It is not part of either the city or county of San Diego governments. The mission of the Water Authority is to provide a safe and reliable supply of water to its 24 member agencies serving the San Diego region's $222 billion economy and its 3.3 million residents." (San Diego County Water Authority, About Us, Frequently Asked Questions and Key Facts <http://www.sdcwa.org/frequently-asked-questions-and-key-facts> [as of June 21, 2017].) The Water Authority stores, treats, and transports imported water to its member agencies, the retail water providers in the region. (*Ibid.*) It operates and maintains dams, a water treatment facility, and "the San Diego region's aqueduct delivery system, which consists of approximately 300 miles of large-diameter pipeline in two aqueducts, 1,600 aqueduct-related structures, and over 100 flow-control facilities, occupying 1,400 acres of right-of-way." (San Diego County Water Authority, Construction, Facilities & Operations <http://www.sdcwa.org/facilities-operations> [as of June 21, 2017].)

D. The State Water Project

One of the two primary sources of water for Metropolitan is the State Water Project. The State Water Project "consists of a series of 21 dams and reservoirs, 5 power plants, and 16 pumping plants which stretch from Lake Oroville in Butte County to Lake Perris in Riverside County. Project water flows from the Feather River to the Sacramento River and then into the Sacramento-San Joaquin Delta. It is lifted by the Delta Pumping Plant into the California Aqueduct, and the aqueduct conveys it south." (*Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 903.) The California Aqueduct is approximately 444 miles long and conveys water to four delivery points near the northern and eastern boundaries of Metropolitan's service area.

5

Metropolitan has access to the State Water Project conveyance system and an annual allotment of Northern California water through a contract with the California Department of Water Resources, which manages the system. The department "has entered into 31 such water contracts with local governmental entities . . . . The contracts require regular payments to the state in return for participation in the [State Water Project] System. Not all the districts actually receive water, but all must make payments according to their respective maximum annual water entitlements and the portion of the System required to deliver such entitlements. Those which actually receive water also pay amounts attributable to the water received." (*Goodman v. County of Riverside, supra,* 140 Cal.App.3d at pp. 903-904, fn. omitted.) The payments under these contracts pay for project operating costs and the public bonds issued to build the system. (*Id.* at p. 905.)

E. The Colorado River

The Colorado River is the other of Metropolitan's primary water sources. The river "rises in the mountains of Colorado and flows generally in a southwesterly direction for about 1,300 miles through Colorado, Utah, and Arizona and along the Arizona-Nevada and Arizona-California boundaries, after which it passes into Mexico and empties into the Mexican waters of the Gulf of California. . . . The river and its tributaries flow in a natural basin almost surrounded by large mountain ranges and drain 242,000 square miles, an area about 900 miles long from north to south and 300 to 500 miles wide from east to west—practically one-twelfth the area of the continental United States excluding Alaska. Much of this large basin is so arid that it is, as it always has been, largely dependent upon managed use of the waters of the Colorado River System to make it productive and inhabitable." (*Arizona v. California* (1963) 373 U.S. 546, 552.)

In 1929, a federal act authorized construction of Hoover Dam to generate electricity, regulate the Colorado River's flow, and apportion the river's water among the several states claiming rights to it. (*Arizona v. California, supra,* 373 U.S. at pp. 560-561.) Metropolitan built the Colorado River Aqueduct to take delivery of its Colorado River water at Arizona's Lake Havasu and transport it to Southern California. Disputes

6

among the states over Colorado River water continued until 1963, when the United State Supreme Court held that California was entitled to a basic allotment of no more than 4.4 million acre-feet per year.[3] (*Id.* at p. 565.) "[T]he court's resolution of the dispute *between* the states—which limited California's share of the river to far less than the state can use—ensured the fight would continue *within* the state for years to come." (*Quantification Settlement Agreement Cases* (2011) 201 Cal.App.4th 758, 772 (*QSA Cases*).)

"In 1929, the year after the Boulder Canyon [Hoover Dam] Project Act took effect, the Secretary of the Interior requested from California's Division of Water Resources a recommendation of the proper apportionments of California's share of Colorado River water among the various applicants and water users within the state. This request led to the 'Seven-Party Agreement' of August 1931. The terms of this agreement, which apportioned a total of 5.362 million acre-feet of water annually between the parties, were incorporated into contracts between the Secretary of the Interior and various California water users for delivery of Colorado River water under the Boulder Canyon Project Act." (*QSA Cases, supra,* 201 Cal.App.4th at p. 783.) The Seven-Party Agreement apportioned more than California's basic allotment because, "for years after the United States Supreme Court determined that California's share of the water from the Colorado River was to be only 4.4 million acre-feet during normal water years, California was nonetheless able to use much more than that because Arizona and Nevada were not yet able to use their full entitlements." (*Id.* at p. 773.)

Parties to the Seven-Party Agreement included Metropolitan and the Imperial Irrigation District (Imperial). (*QSA Cases, supra,* 201 Cal.App.4th at p. 784 & fn. 8.) The agreement "apportioned Colorado River water among the various parties by priority but without quantifying exactly how much water each party was entitled to receive." (*Id.* at p. 785.) Under the agreement, Imperial was the largest single holder of water rights with priority over Metropolitan. (*County of Imperial v. Superior Court* (2007) 152

---

[3] An acre-foot of water is the amount of water that would cover an acre of land to a depth of one foot, which is 325,851 gallons.

Cal.App.4th 13, 19.) Of the 4.4 million acre-feet of water allocated to California, Metropolitan was entitled to only 550,000 acre-feet. The Water Authority possessed no Colorado River rights. (*Ibid.*) This priority system led to conflicts among the water agencies. (*Ibid.*) Imperial, which had more water than it needed, sought to sell its excess water to others while Metropolitan maintained that any excess should be made available to it under the priority system. (*Id.* at pp. 19-20.) Ultimately, Imperial's position prevailed, permitting Imperial to sell its excess water to other agencies, such as Metropolitan and the Water Authority.

"Although the state has broad power under the public trust and reasonable use doctrines to order the reallocation of water, it has exercised this power sparingly." (Gray, *The Modern Era in California Water Law* (1994) 45 Hastings L.Rev. 249, 272.) California has, instead, adopted a policy of voluntary water transfers. (*Id.* at pp. 273-278.) Thus, water-rights holders may transfer surplus or conserved water. (Wat. Code, §§ 382, 1001.)

"In the 1980's, the [State Water Resources Control] Board found some of Imperial's water use practices unreasonable and wasteful. The Board directed Imperial to increase water conservation. One suggested measure by which Imperial could increase conservation was to transfer conserved water to a willing purchaser in exchange for funding to support Imperial's conservation efforts." (*County of Imperial v. Superior Court, supra*, 152 Cal.App.4th at p. 20.) The initial purchaser of Imperial's conserved water was Metropolitan. In 1988, Metropolitan agreed to pay for various projects to conserve water in exchange for which Imperial transferred the conserved water to Metropolitan. In 1998, a decade later, Imperial and the Water Authority entered a similar agreement.

F. Exchange agreements between Metropolitan and the Water Authority

The Water Authority has no means of transporting Colorado River water other than over Metropolitan's aqueduct and thus opened negotiations with Metropolitan to transport, or "wheel," Imperial water. "Wheeling" is the industry term for "[t]he use of a

water conveyance facility by someone other than the owner or operator to transport water." (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1407.) California law mandates that the owner or operator of a water conveyance facility allow others to use up to 70 percent of the facility's unused capacity to transport water upon payment of "fair compensation." (Wat. Code, §§ 1810, 1814; *QSA Cases, supra,* 201 Cal.App.4th at pp. 840-841.)

Metropolitan and the Water Authority failed to reach a wheeling agreement but they did reach a functionally related water exchange agreement. In 1998, the parties agreed that Metropolitan would receive the water conserved by Imperial and promised to the Water Authority under those parties' transfer agreement in exchange for which Metropolitan would provide the Water Authority with a like quality and quantity of water.

In any water transfer, whether by wheeling or an exchange agreement, there is a physical intermingling of the purchased water with water from other sources. As the Water Authority's assistant general manager testified, a direct water delivery could be accomplished only with an empty aqueduct and pipeline from source to buyer, which does not occur in California where water from different sources is intermingled as it moves through an array of reservoirs, aqueducts, and pipelines to reach multiple agencies. Metropolitan cannot deliver "the same molecules" of Colorado River water the Water Authority acquires from Imperial because that water is commingled with "other water Metropolitan has taken off the Colorado River" at Lake Havasu for sale to other member agencies.[4]

While functionally related, wheeling and exchange agreements are not the same. A wheeling agreement calls for the transportation of water when there is available capacity

---

[4] Statutes governing wheeling are not restricted to direct delivery of a distinct volume of water but expressly permit commingled water provided "the transferred water is of substantially the same quality as the water in the facility" and "does not result in a diminution of the beneficial uses or quality of the water in the facility." (Wat. Code, § 1810, subd. (b).)

in the water conveyance system. An exchange agreement promises the delivery of a specified quantity of water. Water is not wheeled unless available, but an exchange agreement requires delivery of an agreed-upon quantity of water every month. Recipients under a wheeling agreement receive less than the transfer amount due to evaporation and other transit losses, but the conveyance system operator bears transit losses under an exchange agreement. As the trial testimony in the present case established, the parties here preferred an exchange agreement to a wheeling agreement. The Water Authority wanted guaranteed delivery and Metropolitan wanted the greater operational flexibility of an exchange agreement that permits the use of available facilities and supply sources.

After entry of the 1998 exchange agreement, disputes continued among the water agencies over Colorado River water allocations that prevented water deliveries. (*QSA Cases, supra,* 201 Cal.App.4th at p. 788.) Negotiations ensued to settle competing claims to Colorado River water, resulting in a number of related agreements, including a 2003 "quantification settlement agreement." (*Id.* at pp. 773, 789.) In those agreements, Metropolitan, the Water Authority, Imperial and other water agencies settled several disputes over the priority, use and transfer of Colorado River water. (*Id.* at p. 789.)

Contemporaneously, in 2003, Metropolitan and the Water Authority executed an amended exchange agreement that is the subject of this appeal. Unable to agree upon the long-term price the Water Authority would be charged for water received under the agreement, the parties agreed to an initial price with future prices linked to standard water rates, lawfully set. The parties agreed: "The price on the date of execution of this agreement shall be two hundred fifty three dollars ($253.00) [per acre-foot]. Thereafter, the price shall be equal to the charge or charges set by Metropolitan's board of directors pursuant to applicable law and regulation and generally applicable to the conveyance of water by Metropolitan on behalf of its member agencies." The Water Authority promised not to challenge conveyance charges set by Metropolitan for five years following

10

execution of the 2003 exchange agreement but reserved the right thereafter to contest the rates as contrary to "applicable law and regulation."[5]

G. Metropolitan's Rate-setting Process

Metropolitan is required by statute to establish rates that will generate sufficient revenue to pay its expenses. (Wat. Code Appen., § 109-134.)[6] For years Metropolitan utilized a single water service rate. In 1998, Metropolitan began a lengthy process to replace the single rate with a new rate structure allocating charges to separate cost components, including water supply and transportation. In adopting the new rate structure, effective 2003, Metropolitan represented that it was designed to create "a cost of service approach consistent with industry guidelines," "[e]nsure that users, including member agencies and other entities, pay the same rates and charges for like classes of services and provide fair allocation of costs through rates and charges," and "[o]ffer choices for services to member agencies and accommodate the development of a water transfer market."

---

[5] The critical provision of the amended exchange agreement reads as follows: "For the term of this agreement, neither [the Water Authority] nor Metropolitan shall seek or support in any legislative, administrative or judicial forum, any change in the form, substance or interpretation of any applicable law or regulation (including the Administrative Code) in effect on the date of this agreement and pertaining to the charge or charges set by Metropolitan's Board of Directors and generally applicable to the conveyance of water by Metropolitan on behalf of its member agencies; provided, however, that . . . after the conclusion of the first five (5) years, nothing herein shall preclude [the Water Authority] from contesting in an administrative or judicial forum whether such charge or charges have been set in accordance with applicable law and regulation."

[6] Water Code Appendix section 109-134 provides, in relevant part: Metropolitan's board "shall fix such rate or rates for water as will result in revenue which, together with revenue from any water standby or availability service charge or assessment, will pay the operating expenses of the district, provide for repairs and maintenance, provide for payment of the purchase price or other charges for property or services or other rights acquired by the district, and provide for the payment of the interest and principal of the bonded debt" Metropolitan incurs.

11

Metropolitan followed a four-step "cost of service process" in setting rates for different service components: (1) estimation of revenue requirements to meet expenses, including operating costs and debt service; (2) allocation of revenue requirements to "different categories based on the operational functions served by each cost," for example revenue necessary to pay for water supply, conveyance and storage; (3) allocation of costs based on their causes and characteristics; and (4) "allocation of costs to rate design elements."

H. Metropolitan's Component Rates

Metropolitan's water service rates are now a combination of component rates calculated to recover its costs incurred in purchasing and transporting water to its member agencies. The rate components, with limited exceptions inapplicable here, are volumetric—the rate is a dollar amount per acre foot.

Metropolitan's "supply" rates are calculated to recover costs incurred in purchasing water supply from the State Water Project and Colorado River and in maintaining and developing additional water supplies through transfers and other transactions. There are two tiers of supply rates, depending on the volume of water provided.

Metropolitan's transportation rates are designed to recover the costs of operating and maintaining its vast water conveyance infrastructure. The transportation rates consist of three subcomponents. A "system access rate" is designed to recover the capital, operating, and maintenance costs associated with transportation facilities, including "conveyance" facilities that transport water from the State Water Project and Colorado River Aqueduct and "distribution" facilities that transport water within Metropolitan's service area. (Admin. Code, § 4123) A "system power rate" recovers the cost of pumping water through the State Water Project and Colorado River Aqueduct to Southern California. (Admin. Code, § 4125.) A "water stewardship rate" is designed to recover the costs of conservation programs and other water management programs that reduce and defer system capacity expansion costs. (See Admin. Code, § 4124.) The transportation

12

rates are so-called postage-stamp rates, which are the same no matter how far the water is transported or which transportation facilities are used.

Metropolitan provides both full service, in which it supplies and transports water, and wheeling service, in which it transports water supplied by others.[7] The rates for full-service and wheeling are comprised of different combinations of the component rates set out above. The full-service rate includes the supply rate, system access rate, system power rate, and water stewardship rate. The wheeling rate includes the system access rate and water stewardship rate. (Admin. Code, § 4405.) A recipient of wheeling service does not pay the system power rate but pays only the actual cost of the power used to transport the water it receives from a third party.

Under the exchange agreement as amended in 2003, the Water Authority agreed to pay charges "generally applicable to the conveyance of water by Metropolitan on behalf of its member agencies" which, the parties agree, are the system access rate, water stewardship rate and, unlike the situation under a standard wheeling agreement, the system power rate.

During the administrative process in which Metropolitan's rates were established, the Water Authority challenged the propriety of applying the system access and water stewardship rates to the wheeling service. Metropolitan's general manager responded that a system access rate was adopted, rather than individual aqueduct access rates, because "Metropolitan's system is not a point-to-point service, but an interconnected regional system." "Operational flexibility has been achieved by creating an interconnected regional delivery network integrating the State Water Project . . . and the Colorado River Aqueduct . . . conveyance systems with the in-basin distribution system. This integrated network allows Metropolitan to incorporate supply from the [project] and the [aqueduct] with a diverse portfolio of geographically dispersed storage programs . . . . This integrated, regional network allows Metropolitan to move supplies throughout the system

_____

[7] Metropolitan's wheeling rate applies only to wheeling by member agencies for up to one year; the charges for other wheeling transactions are negotiated. (Admin. Code, § 4119.)

13

in response to supply availability and operational needs." Metropolitan's general manager asserted that its "integrated, flexible system directly benefits all agencies . . . as to all services, including wheeling and exchange services."

As to the water stewardship rate—"a volumetric charge upon all water moved through the system that provides a dedicated source of funding for conservation and local resources development"—Metropolitan's general manager asserted that all users benefit from water conservation and thus all users are properly charged for it: "conservation, recycling, and groundwater recovery decrease the region's overall dependence on imported water supplies from environmentally sensitive areas like the Bay-Delta; increase the overall level of water supply reliability in Southern California; reduce and defer system capacity expansion costs; and create available space to be used to complete water transfers. Because conservation measures and local resource investments reduce the overall level of dependence on the imported water system, more capacity is available in existing facilities for a longer period of time. The space in the system made available by conservation and recycling is open to all system users."

## II. Trial Court Proceedings

In June 2010, the Water Authority filed its initial action challenging the water rates Metropolitan adopted in April 2010 for 2011 to 2012. In June 2012, the Water Authority filed a second action challenging Metropolitan's 2013-2014 rates.[8] The Water Authority also sought damages for breach of the provision in the amended water exchange agreement providing that "the price shall be equal to the charge or charges set

---

[8] The Water Authority sued Metropolitan and "all parties interested in the validity" of Metropolitan's 2011 to 2014 water rates. A number of Metropolitan member agencies entered the action on the side of Metropolitan and join in this appeal: The City of Los Angeles, acting through the Los Angeles Department of Water and Power; Municipal Water District of Orange County; City of Torrance; Las Virgenes Municipal Water District; West Basin Municipal Water District; Foothill Municipal Water District; Eastern Municipal Water District; Western Municipal Water District; and Three Valleys Municipal Water District. Additionally, member agency Upper San Gabriel Valley Municipal Water District has filed an amicus curiae brief in support of Metropolitan.

14

by Metropolitan's Board of Directors pursuant to applicable law and regulation and generally applicable to the conveyance of water by Metropolitan on behalf of its member agencies." The Water Authority maintained that Metropolitan's rates are not lawful conveyance rates and, thus, not properly charged under the amended agreement. The Water Authority also challenged Metropolitan's method for calculating the extent of its right to Metropolitan supplied water in the event of a water shortage. By statute, the Water Authority has a "preferential right" to Metropolitan water based on its "total payments" to Metropolitan "excepting purchase of water." (Wat. Code Appen., § 109-135.) The Water Authority maintains that, contrary to the position taken by Metropolitan, its payments under the exchange agreement must be included in the calculation of its "preferential rights."

In pretrial proceedings, the court overruled Metropolitan's demurrer based on the statute of limitations. The court also granted Metropolitan's motion for summary adjudication rejecting the Water Authority's claim that Metropolitan imposed an unlawful condition on the water agency's right to petition the courts by precluding member agencies challenging Metropolitan's rate structure from receiving water conservation subsidies funded by that rate structure.

The court informally coordinated the 2010 and 2012 cases and bifurcated the bench trial. The court first determined the validity of Metropolitan's water rates and then decided the contract claim and computation of preferential rights.

In phase one, the court found "no substantial evidence to support Met[ropolitan]'s inclusion in its transportation rates, and hence in its wheeling rate, of 100% of (1) the sums it pays to the California Department of Water Resources' [for the State Water Project] disaggregated by the [State Water Project] as for transportation of that purchased water; and (2) the costs for conservation and local water supply development programs recovered through the Water Stewardship Rate. . . . [T]hese rates over-collect from wheelers, because at least a significant portion of these costs are attributable to supply, not transportation. These rates—the System Access Rate, System Power Rate, Water Stewardship Rate, and Met[ropolitan]'s wheeling rate—therefore violate Proposition 26

15

(2013-14 rates only), the wheeling statutes [(Wat. Code, § 1810 et seq.)], Gov. Code, § 549997(a), and the common law. The court invalidates each rate for both the 2011-2012 and 2013-2014 rate cycles."

In phase two, the trial court found that Metropolitan had breached the price term of the 2003 exchange agreement because it charged the Water Authority transportation rates that were not "consistent with law and regulation." The court awarded the Water Authority damages equal to the total amount the water agency paid under the exchange agreement from 2011 to 2014 for State Water Project costs and the water stewardship rate. The court acknowledged that the award "may overcompensate" the Water Authority by disallowing all State Water Project costs but found that "[i]t asks too much of [the Water Authority] to require it to recalculate Met[ropolitan]'s rates with any useful degree of precision." The court also held that Metropolitan's formula for calculating preferential rights must give the Water Authority credit for amounts paid under the exchange agreement, reasoning that these payments are not for the "purchase of water," which are excluded from that calculation. The court awarded the Water Authority "damages in the amount of $188,295,602 on the breach of contract claims, plus prejudgment interest in the amount of $46,637,180 for a total judgment of $234,932,782."[9] The court also awarded attorney fees of almost $9 million.[10]

---

[9] Damages were based on a rate adjustment. In 2011, one of the years at issue, Metropolitan charged transportation rates totaling $372 an acre foot ($204 system access, $127 system power and $41 water stewardship). The trial court found the lawful rate to be $136 an acre foot ($103 for system access after deduction of State Water Project costs, $33 for system power after deduction of State Water Project costs, and no amount permitted for water stewardship). This reduction in rates resulted in a damages recovery of over $188 million for years 2011 to 2014.

[10] Metropolitan filed a separate notice of appeal from the attorney fee award. It seeks reversal of the judgment, which would set aside the award, but makes no claim of error as to the fee award itself.

### III. Metropolitan's Appeal

A. Statutes of limitations

Metropolitan claims the trial court erred in failing to dismiss the Water Authority's rate challenges as untimely. Metropolitan argues the lawsuits contesting water rates for 2011 to 2014 are, in effect, a challenge to its 2002 issuance of public bonds because bond repayment is dependent on rate revenue. The lawsuits, Metropolitan argues, are barred under statutes requiring that an action to determine the validity of a local agency's bonds be brought within 60 days of bond issuance (Code of Civ. Proc., §§ 860, 863; Gov. Code, § 53511) and by annual legislation validating prior bond issuances. Validation statutes are designed "to settle promptly all questions about the validity" of a public agency's actions. (*McLeod v. Vista United School Dist.* (2008) 158 Cal.App.4th 1156, 1166.) The Water Authority responds that its lawsuits challenge Metropolitan's current rates, not its bond issuance of years ago.[11]

The facts are largely undisputed. In March 2002, Metropolitan adopted a new rate structure effective January 2003 with water rates established for supply, transportation and other service functions. In September 2002, Metropolitan issued bonds "payable from and secured by a pledge of" net operating revenue from water sales. Metropolitan has issued similar bonds in the past. The 2002 bond statement to investors summarized revenue from prior years and described the prior and new rate structure and new rates. Metropolitan has increased its water rates several times between 2002 and today but asserts the "rate structure has remained unchanged with each new rate cycle."

---

[11] The Water Authority also argues the contention is forfeited for failing to preserve it in the trial court and that Metropolitan should be judicially estopped from asserting the contention as it is inconsistent with a position taken in other litigation. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) We grant the October 28, 2016 request for judicial notice of the referenced litigation documents but reject the argument that Metropolitan's claim is procedurally barred. It does concern us that Metropolitan failed to include in its appellant's appendix the demurrer to the 2010 complaint and related documents addressing the issue but, nevertheless, we shall reach the merits of an essentially legal issue.

Metropolitan concedes "that the opportunity to challenge the *amount* of Metropolitan's rates renews with each rate-setting" but argues that the Water Authority's 2010 and 2012 lawsuits are untimely because they challenge the water rate *structure* adopted in 2002. The argument is untenable. Metropolitan first adopted its water rate structure in 2002 but it has readopted that structure in subsequent years when setting rates founded on it. Metropolitan's reenactment and extension of that rate structure to subsequent years, not its initial adoption, is the action being contested.

Fees and rates are "subject to attack" when reenacted, even if they are essentially the same as previous ones for which the statute of limitations has expired. (*Barratt American, Inc. v. City of Rancho Cucamonga* (2005) 37 Cal.4th 685, 702-703.) Were "all subsequent reenactments . . . immune to judicial challenge or review," "there would be no effective enforcement mechanism to ensure that local agencies" base rates on the cost of service. (*Id.* at p. 703.) "[I]mmunity from judicial review" would create "an incentive for local agencies to overvalue the estimated costs of services and then continually readopt that fee." (*Ibid.*)

Metropolitan argues that *Barratt* and similar cases are inapplicable because Metropolitan's rate structure was expressly pledged to the repayment of bonds and the "method of financing" was validated when the 2002 bond issue went unchallenged. Metropolitan notes that the validation of an agency's bond issuance may extend to agency charges that are "part of the bond contract." (*Aughenbaugh v. Bd. of Supervisors* (1983) 139 Cal.App.3d 83, 88.) In *Aughenbaugh*, landowners sought a refund of water charges used to repay bonds financing the water system's construction. (*Id.* at p. 87.) The court found the charges to be part of the bond contract and validated with the bonds. (*Id.* at pp. 88-91.) In that case, "ordinances and resolutions which are part of the bond contract provide[d] that the standby charges in their entirety shall be pledged for the payment of the cost of the bonds." (*Id.* at p. 89.)

*Aughenbaugh* is inapplicable here. Metropolitan's rate structure itself was not pledged for payment of the bonds or otherwise part of the 2002 bond contract. The bond contract promises repayment from net operating revenues, defined as "all revenues

18

received by [Metropolitan] from charges for the sale or availability of water" less operation and maintenance expenses. The bond contract is not premised on a particular charge, rate or rate structure. In fact, Metropolitan is expressly permitted to "prescribe, *revise* and collect" water charges in generating revenue sufficient to repay the bonds. (Italics added.) The sufficiency of that revenue is not threatened by the lawsuits, which do not dispute Metropolitan's right to recover the cost of service through its rates. Modification of the rate structure may affect the distribution of water charges among Metropolitan's member agencies, but it should not affect Metropolitan's net revenue. Metropolitan acknowledged the security of its revenue when the agency assured its investors in subsequently issued bonds that the Water Authority's challenge to the rate structure would have no effect on revenue. A similar acknowledgement occurs in the 2002 bond contract itself, which states that Metropolitan will "generate the same level of revenues" regardless of its rate structure. The bond issuance was not founded on a particular rate structure.

The lawsuits are not time-barred. The Water Authority filed these actions shortly after Metropolitan adopted the challenged water rates. The actions challenge the validity of those rates, not the validity of the earlier bond issuance.

B. Wheeling statutes

The trial court analyzed the validity of Metropolitan's water rates under the wheeling statutes and other legal standards jointly, reasoning that "the core inquiry" was the same: "whether the costs of services (e.g., wheeling) are reasonably related to the costs of providing those services." While there are some differences among the legal standards, we agree that the "core" issue as determined under the wheeling statutes does, as a practical matter, dictate the conclusion that must be reached under the other provisions of law.

The wheeling statutes (Wat. Code, § 1810 et seq.) further the declared "policy of the state to facilitate the voluntary sale, lease, or exchange of water or water rights in order to promote efficient use." (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1409.)

19

With limited exceptions, a public agency with unused capacity in its water conveyance facility may not deny a water transferor the use of the conveyance facility "if fair compensation is paid for that use." (Wat. Code, § 1810.) "Fair compensation" is statutorily defined as "the reasonable charges incurred by the owner of the conveyance system, including capital, operation, maintenance, and replacement costs, increased costs from any necessitated purchase of supplemental power, and including reasonable credit for any offsetting benefits for the use of the conveyance system." (Wat. Code, § 1811, subd. (c).)

The owner of a water conveyance facility determines the amount of fair compensation. (Wat. Code, § 1812, subd. (b).) In making that determination, the owner must "act in a reasonable manner consistent with the requirements of law to facilitate the voluntary sale, lease, or exchange of water and shall support its determinations by written findings. In any judicial action challenging any determination made under this article the court shall consider all relevant evidence, and the court shall give due consideration to the purposes and policies of this article. In any such case the court shall sustain the determination of the public agency if it finds that the determination is supported by substantial evidence." (Wat. Code, § 1813.)

In reviewing the trial court's decision, we note that "the Legislature specifically authorized a water conveyance system owner to determine what is 'fair compensation' ([Wat. Code,] § 1810) subject to certain provisions." (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1431.) When initially introduced, the wheeling legislation provided for the conveyance system owner and wheeler to reach a mutual agreement as to price and, if unable to reach agreement, for a state agency to set the price. (*Id.* at p. 1411.) The Legislature rejected that approach in favor of empowering the conveyance owner to determine fair compensation subject to judicial review. (*Id.* at pp. 1412-1413.)

It is not the court's function to set water rates, but only to determine if substantial evidence supports the fair compensation determination made by the water agency. (Wat. Code, § 1813) Where, as here, a trial court's review is limited to examining the *administrative record* to determine if an agency's decision is supported by substantial

20

evidence, "the appellate court's function is identical to that of the superior court: It will review the administrative record to determine whether the agency findings were supported by substantial evidence, rather than limiting review to the trial court findings." (Eisenberg, Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2016) ¶ 8:128.2, p. 8-91; see *Cal. Assn. of Medical Products Suppliers v. Maxwell-Jolly* (2011) 199 Cal.App.4th 286, 303 [" '[W]hen administrative agency action is judicially reviewable under a substantial evidence standard, the rule for the reviewing trial court and appellate court is the same.' "]; see also *Lewin v. St. Joseph Hospital* (1978) 82 Cal.App.3d 368, 386 ["If the proper scope of review in the trial court was whether the administrative decision was supported by substantial evidence, the function of the appellate court on appeal is the same as that of the trial court, that is, it reviews the administrative decision to determine whether it is supported by substantial evidence."].) Nor are we bound by the trial court's interpretation of the wheeling statutes, which presents a question of law. (*Imperial Irrigation, supra,* 80 Cal.App.4th at p. 1423.)

As noted above, the court found the wheeling statutes violated by Metropolitan's inclusion in its wheeling rate of State Water Project transportation costs, as part of its system access rate, and of the water stewardship rate. These rate components, the trial court concluded, "over-collect from wheelers, because at least a significant portion of these costs are attributable to supply, not transportation." The court found that Metropolitan's payments to the State Water Project, although assessed separately for supply and transportation, are for the single objective of obtaining a water supply and that conservation programs primarily benefit water supply, not transportation.

1. *Inclusion of State Water Project transportation charges in the system access rate*

Neither the Water Authority nor the trial court question the basic premise, established in *Imperial Irrigation* that system-wide transportation costs may be included

21

in the calculation of wheeling rates.[12] (*Imperial Irrigation, supra,* 80 Cal.App.4th 1403.) It is not necessary to limit wheeling charges to the marginal cost of transporting water over the portion of the system utilized in a particular transaction. The trial court nonetheless found that all of Metropolitan's payments to the State Water Project, including those specifically designated for transportation costs, are for the purpose of obtaining a water supply, so that no part of those payments may be included in Metropolitan's wheeling rate. The court "found no reasonable basis" for Metropolitan's contention that the State Water Project "conveyance facilities are a part of [Metropolitan's] conveyance facilities."

We are unable to understand the basis of the trial court's uncertainty. The State Water Project bills for transportation costs separately from water supply and only this portion of the state's charge is the capital and operating cost component of the transportation expense included in Metropolitan's system access rate. Under Metropolitan's contract with the state, the amount of the transportation charge is designed to "return to the state those *costs of the project transportation facilities* necessary to deliver water to the contractor which constitute operation, maintenance, power, and replacement costs incurred irrespective of the amount of project water delivered to the contractor." (Italics added.) Although the state is the owner of the State Water Project and its facilities, Metropolitan is bound to pay its pro rata share of the capital, operation and maintenance costs of the conveyance system. In 2011, this share was over $195 million according to the Water Authority's calculations and constituted approximately 58 percent of the State Water Project's transportation costs. The California Aqueduct unquestionably

---

[12] A recent case confirms that the wheeling statutes do not limit a conveyance owner's compensation to "incremental marginal costs." (*Central San Joaquin Water Conservation Dist. v. Stockton East Water Dist.* (2016) 7 Cal.App.5th 1041, 1052-1053.) Reasonable system-wide costs are recoverable. The court found that "a conveyance owner may [not] compel a nonmember agency to pay a wheeling rate calculated on the basis of a strict proportionate share of capital, overhead, maintenance, and other fixed or ongoing costs." (*Id.* at p. 1055.) The wheeling rate at issue here is not calculated on such a basis and is imposed only on member agencies.

is an integral part of the system by which Metropolitan transports water to its member agencies.

The California Aqueduct and other State Water Project facilities are not restricted to supplying Metropolitan with project water. Metropolitan's State Water Project contract entitles it to use project facilities to store and transport water procured from nonproject sources and Metropolitan does so. Metropolitan has, to date, chiefly used State Water Project facilities to receive project water but this does not establish that the cost of the facilities should be allocated to supply. The facilities are a conveyance network available to Metropolitan for the transport of both project and nonproject water.

A Metropolitan member agency wheeling nonproject water from Northern California does so using State Water Project facilities. Indeed, evidence was presented at trial of a 2009 transaction in which Metropolitan wheeled water through State Water Project facilities on the Water Authority's behalf. Under the view adopted by the trial court, no part of the cost of those facilities could be included in the rate charged to the Water Authority for wheeling that water over those facilities. Indeed, a consequence of the trial court's ruling would be that a wheeler, regardless of which aqueduct is used, would pay for Metropolitan's costs incurred in maintaining the Colorado River Aqueduct but not the California Aqueduct.

The Water Authority makes much of our Supreme Court's remark that Metropolitan's contract with the State Water Project has "a much greater resemblance to a contract for the furnishing of continued water service in the future" than an "agreement for the purchase of an interest in a water system."(*Metropolitan Water Dist. of Southern Cal. v. Marquardt* (1963) 59 Cal.2d 159, 201-202.) Metropolitan has no ownership interest in State Water Project facilities, but the State Water Project contract does more than furnish water to Metropolitan. The contract entitles Metropolitan to use project facilities for conveyance and obligates it and other project contractors, not the state, to pay all costs for building, operating, and maintaining the project's water conveyance structures. (See *Goodman v. County of Riverside* (1983) 140 Cal.App.3d 900, 910 [all project costs are met by payments from agencies with water contracts].) As these costs

23

are incurred by Metropolitan, so too must they be recovered by it. (Wat. Code, § 1811, subd. (c).)

The Water Authority asserts that Metropolitan originally characterized its payments under the State Water Project contract as supply costs and that the record contains no reasonable basis for the change in characterization. Although State Water Project costs were initially deemed supply costs, this practice changed when the agency adopted more particularized cost categories and an unbundled rate structure. The Water Authority relies heavily on a 1969 "Water Pricing Policy Study" prepared for Metropolitan by a consultant, Brown and Caldwell. The study is of little relevance as it predates the rates at issue here by more than 40 years and employed a limited set of cost categories distinct from those used today. Brown & Caldwell used only four functional cost categories in its 1969 report: "supply system," "distribution system," "water treatment facilities," and "administrative and general costs." "Supply system" costs included "facilities whose function is the delivery of water from the sources of supply to the [Metropolitan] distribution system," including the Colorado River Aqueduct and the State Water Project (excluding its terminal reservoirs). The "distribution system" picked up where the "supply system" left off, moving water from Metropolitan's major conduits to the localized member agencies. In the 1969 study, Metropolitan's costs for both the State Water Project and the Colorado River Aqueduct, representing most of the agency's expenses, were placed in an undifferentiated "supply" category.

Water rate authorities advised more refined cost categories. In 1993, a water rates analyst published a treatise recommending a greater array of functional cost categories dividing supply from conveyance and transmission costs. (Raftelis, Comprehensive Guide to Water and Wastewater Finance and Pricing (2nd ed. 1993) p. 168.) In October 1995, Resource Management International, Inc. (RMI) prepared a rate study for Metropolitan recommending that operating expenses be functionalized into a number of categories that separate supply (cost of purchasing water and maintaining dams) from transmission (cost of "operating and maintaining the aqueducts to move water from sources of supply to major centers of demand"). In May 1996, RMI characterized the

24

State Water Project transportation payment as a transmission cost. RMI found state charges for capital, operation and maintenance charges for project facilities to be "clearly transmission-related" and properly allocated to Metropolitan's transmission or transportation costs.[13]

In 1997, Metropolitan adopted Resolution 8520 establishing a wheeling rate "to recover fair compensation for the use of its conveyance system." Metropolitan determined that its State Water Project transportation cost is properly included in the wheeling rate as a cost of water transmission because, among other things, Metropolitan has "the right to use [State Water Project] transport facilities for its own purposes, subject to certain conditions." The resolution states: "[I]t is appropriate to set the wheeling rate on a 'postage stamp' basis; that is, a uniform rate per acre-foot of water wheeled regardless of the source of the water, the facilities used in the transaction or the distance the water is moved. A uniform rate is appropriate because of the integrated nature of Metropolitan's conveyance system; because Metropolitan's historic and current rate setting policy has been, and is, based on the postage stamp concept; because postage stamp rate setting is the standard among California water supply entities; because of the administrative impracticability of establishing point-to-point rates; because . . . the Metropolitan Water District Act requires that rates shall be uniform for like classes of service throughout Metropolitan; and because [the] Water Code . . . defines 'fair compensation' to include reasonable charges for the use of the entire conveyance 'system.' "

In its 2002 report of rates and charges, Metropolitan described what remains its current rate structure. Water rates were "unbundled into separate services of supply, conveyance and distribution, water stewardship and power." State Water Project costs

---

[13] The Water Authority claims earlier RMI reports are inconsistent with this conclusion but the cited material does not support the contention. The earlier reports simply state that Metropolitan purchases water from the State Water Project and include a chart of Metropolitan's projected expenditures. The cited pages have nothing to do with the functionalization of costs.

were divided between supply, conveyance and power "to allow a more detailed level of analysis to be performed during the evaluation of rate design alternatives." The State Water Project Delta water charge and the cost of storage and transfer programs were delegated to supply and the capital, operations, maintenance and overhead costs for project facilities that convey water to Metropolitan's service area were delegated to conveyance. Power costs to convey water was separately stated.[14] Rates were based on these functional categories, with the system access rate recovering the system-wide cost of providing conveyance and distribution. The report states that the system access rate provides "a non-discriminatory rate to all parties that wish to use available system capacity to move water anywhere in the [Metropolitan] service area" creating "the opportunity for a fair and efficient water transfer market to develop." Member agencies purchasing water from Metropolitan or a third party "will pay the exact same cost for access to the system."

In 2010, Raftelis Financial Consultants, Inc. reviewed Metropolitan's rate methodology and found it consistent with industry standards. Concerning the State Water Project, the financial consultant noted that the project provides an annual statement of charges that invoices separately for supply and transportation and stated it was "appropriate" for Metropolitan to assign "these components to the respective functional categories."[15]

The Water Authority offered a different expert assessment. Its retained consultant opined that State Water Project costs should be allocated to supply alone, not allocated between supply and transportation. Bartle Wells Associates approved Metropolitan's practice of dividing Colorado Aqueduct costs between supply and transportation but

---

[14] The estimated revenue requirement to pay Metropolitan's State Water Project expenses in fiscal year 2003 was supply $48 million, conveyance $127 million and power $107 million.

[15] The Water Authority says this statement was "suborned" by Metropolitan. The consultant used language offered by Metropolitan executives to describe State Water Project charges but there is nothing to suggest the consultant did not freely embrace the characterization.

26

concluded that a similar division of State Water Project costs was improper because Metropolitan does not own or operate the latter facilities. As discussed, this heavy reliance on ownership is misplaced because the State Water Project owner does not bear its costs—Metropolitan and other contracting agencies do.

In any event, the courts do not weigh competing methodologies to determine the best water rates. We determine only whether substantial evidence supports the fair compensation determination made by the rate-setting agency. Metropolitan's determination is well supported by the record and must be affirmed as regards its system access rate that recovers the cost of its State Water Project transportation payments. The inclusion of these payments in the calculation of Metropolitan's wheeling rate does not violate the wheeling statutes.

### 2. *Inclusion of the water stewardship rate*

As indicated above, Metropolitan's wheeling rate also includes a water stewardship rate component designed to fund water conservation programs. (Admin. Code, § 4124.) As part of its legislative mandate to "expand water conservation, water recycling, and groundwater recovery efforts" (Wat. Code Appen., § 109-130.5, subd. (2)), Metropolitan enters into contracts with its member agencies that are designed to develop and conserve local water resources. It funds these programs through the water stewardship rate.

The trial court found the water stewardship rate to be supply-related, not transportation-related, because the primary benefit of such programs is a reduced need for imported water through development of local water supplies. Metropolitan contends that its "allocation of the Water Stewardship Rate to transportation is reasonable because the demand-management programs it funds create several transportation-related benefits." Metropolitan states that less demand for imported water assures unused capacity for wheeling and reduces capital expenditures for expansion of the conveyance and distribution system.

27

The record fails to support Metropolitan's inclusion of the water stewardship rate as a transportation cost. A 2012 report prepared by Metropolitan itself states that "[t]he central objective of Metropolitan's water conservation program is to help ensure adequate, reliable and affordable water supplies for Southern California by actively promoting efficient water use."

A water agency's payments to its members to encourage water conservation is outside the scope of recoverable costs contemplated by the wheeling statutes. As previously noted, "fair compensation" for a wheeler's use of a conveyance system is statutorily defined as "the reasonable charges incurred by the owner of the conveyance system, including capital, operation, [and] maintenance" costs. (Wat. Code, § 1811, subd. (c).) "[A] water conveyance system owner is entitled to reasonable charges it *incurs* 'for the use of the conveyance system' ([Wat. Code,] § 1811, subd. (c)) when there is unused capacity available. . . . We must give the word 'incurred' its usual and ordinary meaning. [Citations.] . . . 'Charges incurred' refers to costs a person becomes subject to or liable for because of an act or transaction. [Citations.] . . . '[F]air compensation ([Wat. Code,] § 1810) includes charges the owner, in this case the Metropolitan Water District, becomes subject to or liable for in using the 'conveyance system' ([Wat. Code,] § 1811, subd. (c)) to wheel water when it has unused capacity." (*Imperial Irrigation, supra,* 80 Cal.App.4th at pp. 1430-1431.)

Metropolitan's payments to member agencies to fund water conservation programs is not a cost of using the conveyance system to wheel water. Funding conservation programs may lessen capital expenditures for system expansion in the future, as Metropolitan asserts, but that potential savings is not recoverable under the terms of the statute that permits recovery for actual conveyance costs—not avoided costs.

Water conservation is of undeniable importance. However, the narrow question here is whether substantial evidence supports Metropolitan's determination that the water stewardship rate used to fund conservation programs is recoverable as "fair compensation" for use of the conveyance system. (Wat. Code, § 1811, subd. (c).) The answer is no.

28

C. Common law

The trial court also found Metropolitan's wheeling rate and exchange agreement transportation rates in violation of the common law. Under the common law, rates are invalid if they are not based "on the cost of service or some other reasonable basis." (*County of Inyo v. Public Utilities Com.* (1980) 26 Cal.3d 154, 159, fn. 4.) In evaluating validity, "[s]ubstantial deference must be given to [Metropolitan's] determination of its rate design. [Citation.] 'Rates established by the lawful rate-fixing body are presumed reasonable, fair and lawful.' " (*San Diego County Water Authority v. Metropolitan Water Dist.* (2004) 117 Cal.App.4th 13, 23, fn. 4.)

In finding a violation of the common law, the trial court relied on the same reasoning on which it based its conclusions under the wheeling statutes. For the same reasons we reject its conclusion under the common law with respect to Metropolitan's system access rate and agree with its conclusion with respect to the water stewardship rate.

As discussed above, Metropolitan's conveyance system encompasses both its own facilities and State Water Project facilities, which are used as an integrated system to transport water to Southern California. In addition to the evidence summarized above, we also note that Metropolitan commonly uses a single reservoir with intermingled water from the State Water Project and the Colorado River to supply member agencies. The Water Authority purchased Colorado River water from Imperial but, under the exchange agreement, received from Metropolitan a mix of water amounting to roughly 59 percent Colorado River water and 41 percent State Water Project water. At trial, the Water Authority asserted that Metropolitan's use of project water to fulfill the exchange agreement was simply a matter of Metropolitan's convenience, as it was physically possible to route Colorado River water directly to the Water Authority. The point, however, is that Metropolitan uses State Water Project facilities in its standard operations. To dismiss that use as one of convenience alone minimizes the operational

29

constraints placed on a regional water agency that transports water from multiple sources to multiple agencies.

As discussed above, the trial court properly found the water stewardship rate to be supply-related, not transportation-related, so that its inclusion as a component of the wheeling rate and exchange agreement transportation rates is also unlawful under the common law.[16] Having made that determination, we need not evaluate the validity of that rate under the other provisions on which the trial court relied.

D. Proposition 26

The Water Authority asserts, and the trial court found, that the system access and system power rate components in the wheeling and exchange agreement transportation rates violate a constitutional provision enacted as Proposition 26 requiring voter approval for tax levies (Cal Const., art. XIII C, § 1).[17]

All taxes imposed by a local governmental entity are subject to voter approval. (Cal Const., art. XIII C, § 2, subd. (b).) Proposition 26, adopted in 2010, expanded the definition of a tax to include "any levy, charge, or exaction of any kind" except specified charges and assessments. (*Id.*, § 1, subd. (e).) Among the exclusions from the definition of a tax is "[a] charge imposed for a specific government service or product provided directly to the payor that is not provided to those not charged, and which does not exceed the reasonable costs to the local government of providing the service or product."[18] (*Id.*, § 1, subd. (e)(2).) Metropolitan argues that Proposition 26 is inapplicable because its water rates are not "imposed" but adopted by a voluntary cooperative of water agencies. Whether or not "imposed," the system access and system power rates are not tax levies

---

[16] Metropolitan is correct in asserting that the holding here does not preclude it from including the water stewardship rate component in its full-service rate.

[17] The trial court's Proposition 26 finding concerned rates only for 2013 and 2014.

[18] The Water Authority says Metropolitan failed to raise below the payor-specific services exception. In fact, the issue was fully briefed.

subject to voter approval but are service charges that do not exceed the reasonable costs to Metropolitan of providing water conveyance.

Metropolitan "bears the burden of proving by a preponderance of the evidence" that its charge is not a tax and that the amount charged "is no more than necessary to cover the reasonable costs of the governmental activity." (Cal. Const., art. XIII C, § 1.) "We review de novo the question whether the challenged rates comply with constitutional requirements. [Citation.] We review the trial court's resolution of factual conflicts for substantial evidence." (*Newhall County Water Dist. v. Castaic Lake Water Agency* (2016) 243 Cal.App.4th 1430, 1440 (*Newhall*).)[19]

The challenged rates comply with constitutional requirements. As previously discussed, Metropolitan's system access and system power rates recover the cost of its State Water Project transportation payment and other costs incurred in maintaining a water conveyance system. Metropolitan provides a specific service (use of the conveyance system) directly to the payor (a member agency) that is not provided to those not charged and which does not exceed the reasonable costs to Metropolitan of providing the service. (Cal. Const., art. XIII C, § 1, subd. (e)(2).)

The Water Authority relies on *Newhall* to argue that Metropolitan's water rates violate Proposition 26 but that case presents a far different factual situation. In *Newhall*, a wholesale water agency's rate for supplied water was composed of a volumetric charge and a fixed fee based on a retail water agency's water usage of both water supplied and groundwater not supplied by the wholesaler. (*Newhall, supra,* 243 Cal.App.4th at pp. 1436-1438.) "Because the rates are based on total water demand, the more groundwater a retailer uses, the more it pays under the challenged rates. The use of groundwater demand in the rate structure necessarily means that, in effect, the [wholesaler] is charging for groundwater use." (*Id.* at p. 1446.) The court concluded that the wholesale water agency "cannot, consistent with Proposition 26, base its wholesale

---

[19] The parties each request judicial notice of court documents filed in connection with a request to depublish *Newhall*. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).) We grant the unopposed requests filed August 3 and September 23, 2016.

water rates on the retailers' use of groundwater, because the [wholesaler] does not supply groundwater." (*Id.* at p. 1441.) "[T]he demand for a product the Agency does not supply —groundwater—cannot form the basis for a reasonable cost allocation method: one that is constitutionally required to be proportional to the benefits the rate payor receives from (or the burden it places on) the [wholesale] Agency's activity." (*Id.* at p. 1442.)

Here, Metropolitan charges for a service it supplies—water conveyance—and that charge is founded on the costs borne by Metropolitan in maintaining the conveyance system. The volumetric system access and system power rates paid by the Water Authority bear a fair and reasonable relationship to the benefits it receives from its use of the conveyance system and the burden its use places on that system.

E. Government Code section 54999.7

The trial court held that Metropolitan's water rates also violate a Government Code provision regulating public utility service rates. The statute provides: "Any public agency providing public utility service may impose a fee, including a rate . . . for any product, commodity, or service provided to a public agency . . . . Such a fee for public utility service, other than electricity or gas, shall not exceed the reasonable cost of providing the public utility service." (Gov. Code, § 54999.7, subd. (a).)

Metropolitan claims the statute applies to retail utility agencies alone, not to a wholesale water agency like itself. We need not address this issue because, for the reasons previously discussed, the system access and system power rates do not exceed the reasonable cost of providing water transportation. Whether or not the statute applies, it has not been violated.

F. Breach of contract

As the trial court held, to the extent that the price Metropolitan charged the Water Authority for wheeling was based on an unlawful rate, there was a breach of the amended exchange agreement providing for future prices "equal to the charge or charges set by Metropolitan's Board of Directors pursuant to applicable law and regulation and generally applicable to the conveyance of water by Metropolitan on behalf of its member

32

agencies." Since we have concluded that Metropolitan's system access rate was not improperly included in the wheeling charges, there was no breach in that respect and damages should not have been calculated on that erroneous premise. Since the water stewardship rate was unlawfully charged for the conveyance of water, there was a breach of the agreement in that respect. The Water Authority is entitled to recover damages limited to the overcharges attributable to the unlawful inclusion of the water stewardship rate.

Metropolitan has made several assertions on appeal denying an enforceable contract and actionable breach but none is persuasive. The contract was not illegal at its inception for including a variable price term that was ultimately found to contain an unlawful rate component. Also, contrary to Metropolitan's arguments, the evidence sufficiently establishes a violation of the contractual price term, not just the wheeling rate, and actionable injury is shown by payment of a water stewardship rate unrelated to the transportation services provided.

We must remand the matter for a redetermination of damages based solely on overcharges from inclusion of the water stewardship rate. Prejudgment interest must also be recalculated. On this subject, Metropolitan contends the statutory rate of interest was wrongly used in the original proceedings because the exchange agreement stipulates a contractual rate. This contention is unsupported by the terms of the exchange agreement, as the trial court rightly held.

## G. The Water Authority's preferential right to water supplies

Metropolitan contends the trial court misapplied a statutory provision that establishes a formula for the preferential right of Metropolitan member agencies to obtain available water supplies in the event of a shortage. (Wat. Code Appen., § 109-135.) The statute grants member agencies "a preferential right" to Metropolitan-supplied water proportionate to the member's past payments toward Metropolitan's capital and operating

33

costs, excluding payments for the "purchase of water."[20] (*Ibid.*) The trial court found "the Exchange Agreement was not an agreement pursuant to which [the Water Authority] obtained water from [Metropolitan], but instead an agreement pursuant to which [Metropolitan] in effect conveyed water on behalf of [the Water Authority]." Thus, the Water Authority's "payments under the exchange agreement must be included in the preferential rights calculation." We agree with this conclusion.

Metropolitan's major source of revenue has shifted from property taxes to water sales, making the exclusion of water purchases from the calculation of preferential rights of increasing significance and contention. (*San Diego County Water Authority v. Metropolitan Water Dist., supra,* 117 Cal.App.4th at p. 23.) In prior litigation between the parties, this district court of appeal upheld Metropolitan's interpretation of the preferential rights statute to mean that amounts paid for water purchases are not to be taken into account in determining preferential rights even when those amounts are calculated to include the recovery of capital and operating costs. (*Id.* at pp. 24-25.) The court held that "where the operating expenses and capital costs of Metropolitan are included in the rate charged for the water" a member is not "entitled to receive preferential rights credits for that amount of the water charges attributable" to those costs and expenses. (*Id.* at p. 25.)

Metropolitan excludes from its calculation of preferential rights all volumetric payments for the purchase of Metropolitan water, including the supply rate and transportation rate components. The Water Authority does not challenge that

---

[20] "Each member public agency shall have a preferential right to purchase from the district for distribution by such agency, or any public utility therein empowered by such agency for the purposes, for domestic and municipal uses within the agency a portion of the water served by the district which shall, from time to time, bear the same ratio to all of the water supply of the district as the total accumulation of amounts paid by such agency to the district on tax assessments and otherwise, excepting purchase of water, toward the capital cost and operating expense of the district's works shall bear to the total payments received by the district on account of tax assessments and otherwise, excepting purchase of water, toward such capital cost and operating expense." (Wat. Code Appen., § 109-135.)

34

methodology here. The only question presented on this appeal is whether the Water Authority's payments under the exchange agreement are for the purchase of Metropolitan water and thus properly excluded from the calculation of preferential rights.

We "independently judge the text of the statute, taking into account and respecting" the interpretation of its meaning accorded by the administrative agency charged with its enforcement, here Metropolitan. (*Yamaha Corp. of America v. State Bd. of Equalization* (1998) 19 Cal.4th 1, 7.) We review the interpretation of a written contract de novo unless the interpretation turns upon the credibility of extrinsic evidence. (*Coopers & Lybrand v. Superior Court* (1989) 212 Cal.App.3d 524, 529.)

The exchange agreement cannot fairly be construed to constitute a purchase of water from Metropolitan within the meaning of the preferential rights statute. The purpose, structure and terms of the contract make it clear that the Water Authority is not purchasing water from Metropolitan but from Imperial. As the trial court rightly discerned, the Water Authority is exchanging water with Metropolitan "to make use of its own independent supplies."

The contract expressly provides that the water delivered to the Water Authority "shall be characterized as Metropolitan water . . . only for the limited purposes of [the price provision] and the interim agricultural water program." Under the referenced price provision, the Water Authority agreed to pay a price equal to the transportation rates lawfully set for the conveyance of Metropolitan-supplied water. In agreeing to pay rates equal to the Metropolitan-supplied water rates, the Water Authority did not agree it was purchasing Metropolitan water. There was no purchase of Metropolitan water and, thus, payments under the exchange agreement must be credited in the calculation of preferential rights.

## IV. The Water Authority's Cross-appeal

### A. Metropolitan imposes an unconstitutional condition on member agencies' participation in water conservation programs

Metropolitan uses revenue from its water stewardship rate to fund water conservation programs. The programs are designed to meet Metropolitan's "long term water supply reliability goals" and satisfy a legislative mandate to "expand water conservation, water recycling, and groundwater recovery efforts." (Wat. Code Appen., § 109-130.5.) To implement these programs, Metropolitan "enters into project contracts, on a discretionary basis, with its member agencies" that "require the contracting parties to develop and implement local resource development, conservation and/or desalination projects." Under the local resource development and seawater desalination projects, Metropolitan "pays up to $250 for each acre-foot of water produced" and, under the conservation credits program, Metropolitan "pays a specific amount for each acre-foot of water estimated to be conserved." Metropolitan "anticipates spending hundreds of millions of dollars" on these programs.

Since April 2005, Metropolitan has included in all water conservation program contracts a page-long "Rate Structure Integrity" (RSI) clause. The clause states, in relevant part, that the contracting member agency "agrees and understands" that the existing rate structure "provides the revenue necessary to support" conservation programs. The agency further agrees to address "any and all" disputes regarding the existing rate structure through the administrative process and "if they file or participate in litigation or support legislation to challenge or modify [Metropolitan's] existing rate structure . . . Metropolitan may initiate termination of this agreement." If Metropolitan decides to terminate it must provide written notice to the agency, which may request mediation of the dispute. "If mediation does not result in an agreement acceptable to each party . . . the notice of intent to terminate shall be reinstated." The RSI clause makes no provision for restoring terminated benefits if a court upholds a recipient's challenge to Metropolitan's rates and finds the challenged rates to be illegal.

Metropolitan deems the Water Authority's initiation of the 2010 and 2012 lawsuits at issue on this appeal to be a violation of the RSI clause. Shortly after the Water Authority filed the 2010 action, Metropolitan sent notice of its intention to terminate six water conservation project contracts containing the RSI clause. In response, the Water Authority requested mediation, as contemplated by the RSI clause. After an unsuccessful mediation, there were only four ongoing project contracts subject to termination, as the other two had been fully performed according to their terms. On June 14, 2011, Metropolitan's board voted to terminate two of the remaining four project contracts that contained the RSI provision. The other two contracts were amended to provide payments directly to residents and businesses in the Water Authority's service region. After terminating the agreements, Metropolitan "deferred" all "pending incentive agreements" and declared that future agreements "will not be executed" without further board action.

The Water Authority sought a declaratory judgment declaring invalid and unenforceable the RSI clause. The Water Authority alleges the RSI clause constitutes an "unconstitutional condition" on the Water Authority's ability to receive program funding and is unlawful under Civil Code section 1668 by seeking to exempt Metropolitan from "liability for setting rates in violation of California law." In pretrial proceedings, Metropolitan and the Water Authority each moved for summary adjudication of the declaratory relief cause of action. The trial court adjudicated the claim in Metropolitan's favor. The court found the RSI clause satisfies all elements of an unconstitutional condition but that the Water Authority lacks standing to assert the claim. The court found that the Water Authority, a public agency, "does not have an independent constitutional right to petition the legislature or the courts to challenge Metropolitan's water rates because that is an inherently individual right." The court also found Civil Code section 1668 inapplicable because Metropolitan did not seek to contract away all liability but imposed only a financial disincentive to legal challenges. Following trial, the court entered judgment on this cause of action in favor of Metropolitan. Our review on appeal is de novo. (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334; *Davis v. Kiewit Pacific Co.* (2013) 220 Cal.App.4th 358, 363.)

Metropolitan's stated purpose for the RSI clause is "to ensure funding for its long-term project contracts by protecting the stability of [its] integrated rate structure, which provides the funds necessary to pay for the . . . programs." Metropolitan asserts that " '[l]egal and legislative challenges to Metropolitan's rate structure outside the established public board process could have an adverse impact on Metropolitan's ability to sustain project and program funding and are disruptive and costly.' " Metropolitan concedes that "[t]he possibility that [the Water Authority] might sue to challenge [Metropolitan's] rates was a consideration in proposing the RSI provision."

The Water Authority alleges the RSI clause violates article I, section 3 of the California Constitution.[21] The Water Authority contends that the clause purports "to allow Metropolitan, a government entity, to deprive the Water Authority of its constitutional right to petition the courts of this state for redress of legitimate legal grievances against Metropolitan, by allowing Metropolitan the right to unilaterally terminate the project contracts in the event that the Water Authority challenges Metropolitan's rates in court." The Water Authority argues the RSI clause imposes an "unconstitutional condition" on water conservation program funding.

The doctrine of unconstitutional conditions limits the government's power to require one to surrender a constitutional right in exchange for a discretionary benefit. (*Dolan v. City of Tigard* (1994) 512 U.S. 374, 385.) When receipt of a public benefit is conditioned upon the waiver of a constitutional right, the " 'government bears a heavy burden of demonstrating the practical necessity for the limitation.' " (*Robbins v. Superior Court* (1985) 38 Cal.3d 199, 213.) "[H]owever well-informed and voluntary that waiver, the governmental entity seeking to impose those conditions must establish: (1) that the conditions reasonably relate to the purposes sought by the legislation which confers the benefit; (2) that the value accruing to the public from imposition of those conditions manifestly outweighs any resulting impairment of constitutional rights; and (3) that there

---

[21] Article I, section 3(a) of the California Constitution provides: "The people have the right to instruct their representatives, petition government for redress of grievances, and assemble freely to consult for the common good."

are available no alternative means less subversive of constitutional right, narrowly drawn so as to correlate more closely with the purposes contemplated by conferring the benefit." (*Parrish v. Civil Service Com.* (1967) 66 Cal.2d 260, 271 (*Parrish*).)

In *Parrish*, the California Supreme Court ruled a county could not constitutionally condition the continued receipt of welfare benefits upon the recipients' advance consent to random, exploratory searches of their homes—searches otherwise prohibited by the Fourth Amendment. (*Parrish, supra,* 66 Cal.2d at pp. 270-275.) In *Dolan*, the United States Supreme Court protected the Fifth Amendment right to just compensation in holding a city could not condition approval of a building permit on the landowner's dedication of a portion of the owner's property for public use. (*Dolan v. City of Tigard, supra,* 512 U.S. at p. 385.) The doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up." (*Koontz v. St. Johns River Water Mgmt. Dist.* (2013) __ U.S. __, __ [133 S.Ct. 2586, 2594].)

We agree with the trial court that the RSI clause imposes an unconstitutional condition on water conservation funding. Metropolitan argues that payments under the water conservation contracts are not "public benefits" so that the unconstitutional conditions doctrine does not apply. Metropolitan says public benefits are those made available to the general public, such as welfare benefits or the use of public property. But the term "public benefit" simply means a benefit conferred by a government entity, as opposed to a benefit conferred by a private actor. (See *Robbins v. Superior Court, supra,* 38 Cal.3d at p. 213 [using public benefit and government benefit interchangeably].) The doctrine has been applied to benefits given to a discrete group or organization (*Evans v. City of Berkeley* (2006) 38 Cal.4th 1, 5-6) and local agencies (*Sonoma County Org. of Public Employees v. County of Sonoma* (1979) 23 Cal.3d 296, 318-319).

Also unavailing is Metropolitan's argument that the Water Authority waived its right of petition by entering into water conservation contracts containing an RSI clause surrendering that right. In fact, a Water Authority executive testified that the agency entered the contracts under a reservation of rights, believing the RSI clause to be "unlawful and unenforceable." The argument also fundamentally misconstrues the

39

unconstitutional conditions doctrine. Under the doctrine, a waiver of constitutional rights, "however well-informed and voluntary that waiver," is invalid when wrongly conditioned upon receipt of a public benefit. (*Parrish, supra,* 66 Cal.2d at p. 271.)

We also reject Metropolitan's contention that material issues of fact exist to preclude summary adjudication. The undisputed facts show insufficient justification for the punitive RSI clause. To justify such a measure, Metropolitan must show that (1) conditioning water conservation program payments on member agencies' surrender of their petitioning rights is reasonably related to rate stability; (2) the public value of imposing the condition manifestly outweighs its burden on constitutional rights; and (3) there are no less restrictive means to achieve rate stability. (*Parrish, supra,* 66 Cal.2d at p. 271.) As the trial court rightly concluded, the evidence shows Metropolitan can obtain sufficient funding for its water conservation programs without barring member agencies from water rate challenges. Metropolitan asserts that "factual issues remain" as to whether the RSI clause is narrowly tailored to achieve rate stability, but Metropolitan has tendered no evidence tending to show the absence of feasible alternatives. To the contrary, Metropolitan itself has advised its bondholders, "To the extent that a court invalidates Metropolitan's adopted rates and charges, Metropolitan will be obligated to adopt rates and charges that comply with any mandates imposed by the court. Metropolitan expects that such rates and charges would still recover Metropolitan's cost of service. As such, revenues would not be affected." If Metropolitan's rates are revised in the manner proposed by the Water Authority in the complaint, other member agencies may pay higher rates unless other actions are taken by the board. "[A]ny impairment of the right to petition, including any penalty exacted after the fact, must be narrowly drawn." (*Wolfgram v. Wells Fargo Bank* (1997) 53 Cal.App.4th 43, 57.) Our review of the record finds no evidence sufficient to raise a triable issue of fact on the issue.

Although the trial court correctly held the RSI clause contains the elements of an unconstitutional condition, the court denied the prayer to invalidate the provision on the ground that the Water Authority lacks the standing to challenge the condition. In this respect, we conclude the trial court erred. The constitutional right at issue here is the right

40

to petition government for the redress of grievances under article I, section 3(a) of the California Constitution. The right to petition includes the right to seek judicial relief. (E.g., *Jersey v. John Muir Medical Center* (2002) 97 Cal.App.4th 814, 821.) The trial court, noting that the provision recognizes the right of the *people* to petition government, held the right applies only to individuals, not to public agencies. The court found no "direct state law on the issue whether governmental actors have a [constitutional] right to petition" and observed that the California Supreme Court has not yet decided the issue. (See *Vargas v. City of Salinas* (2009) 46 Cal.4th 1, 16-17 [declining to decide the issue].)[22] However, several appellate courts, applying the statute authorizing special motions to strike strategic lawsuits against public participation (SLAPP) (Code Civ. Proc., § 425.16), have held that government entities do have First Amendment rights, including the right to petition. (E.g., *Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments* (2008) 167 Cal.App.4th 1229, 1237; *Bradbury v. Superior Court* (1996) 49 Cal.App.4th 1108, 1117.)

In *Bradbury,* the court deemed "without merit" the argument that the anti-SLAPP statute protects private citizens but not government entities. (*Bradbury v. Superior Court, supra,* 49 Cal.App.4th at pp. 1113-1114.) That argument is wrongly "premised on the theory that a government entity and its representatives have no First Amendment rights." (*Ibid.*) The court held that the request of a county and its representative for investigation by law enforcement agencies was "in furtherance of the right to petition government for grievances." (*Id.* at p. 1117.) *Santa Barbara Coalition* concerned a local transit agency; that case likewise held that "government agencies and their representatives have First Amendment rights, and are 'persons' entitled to protection under [Code Civil Procedure] section 425.16, subdivision (b)." (*Santa Barbara County Coalition Against Automobile Subsidies v. Santa Barbara County Assn. of Governments, supra,* 167 Cal.App.4th at p. 1237.)

---

[22] Likewise, the United States Supreme Court has declined to decide whether government entities have First Amendment rights, or may assert an "unconstitutional conditions" claim. (*United States v. Am. Library Assn., Inc.* (2003) 539 U.S. 194, 210-211.)

Although the California Supreme Court approved these cases as a matter of statutory interpretation without reaching the constitutional issues (*Vargas v. City of Salinas, supra,* 46 Cal.4th at pp. 16-17), the high court expressed no disapproval of these decisions. As the Water Authority rightly observes, the anti-SLAPP statute protects acts in furtherance of the constitutional right of petition, indicating that government agencies' petitioning rights must ultimately be grounded in the Constitution. Although federal courts are divided on the issue, the Ninth Circuit, as well as the Second, Third, and Seventh Circuits, have recognized in the context of *Noerr-Pennington*[23] and other issues that government agencies are protected by the First Amendment right to petition. (*Manistee Town Center v. City of Glendale* (9th Cir. 2000) 227 F.3d 1090, 1093; see *Mosdos Chofetz Chaim, Inc. v. Village of Wesley Hills* (S.D.N.Y. 2010) 701 F.Supp.2d 568, 598-602.)

In holding that San Diego Water Authority has no constitutional right to petition, the trial court relied primarily on *Star-Kist Foods, Inc. v. County of Los Angeles* (1986) 42 Cal.3d 1, 5-10 (*Star-Kist*). That case upheld the standing of local and county governments to challenge a state law exempting from ad valorem taxation business inventories of foreign origin or destination shipped through the state. "Standing" in the context of that case referred "not to traditional notions of a plaintiff's entitlement to seek judicial resolution of a dispute, but to a narrower, more specific inquiry focused upon the internal political organization of the state: whether counties and municipalities may invoke the federal Constitution to challenge a state law which they are otherwise duty-bound to enforce." (*Id.* at pp. 5-6, fn. omitted.) In upholding the right of the local government agencies to challenge a state law as interfering with Congress' exclusive

---

[23] See *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.* (1961) 365 U.S. 127, 136 ("[T]he Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive [or a court] to take particular action with respect to a law that would produce a restraint or a monopoly."); *United Mine Workers v. Pennington* (1965) 381 U.S. 657, 670 ("Joint efforts to influence public officials do not violate the antitrust laws even though intended to eliminate competition.").

control over commerce, the court distinguished the "structural" rights at issue in that case and in cases arising under the Constitution's supremacy clause from individual rights that governmental entities have no right to enforce against the state. (*Id.* at p. 8.)[24] "Counties and cities must look to the state Constitution and the Legislature for their creation and delegated powers. [Citation.] Counties are 'merely . . . political subdivision[s] of state government, exercising only the powers of the state, granted by the state, created for the purpose of advancing "the policy of the state at large . . . ." ' [Citation.] Though municipalities may enjoy a greater degree of autonomy with regard to local affairs [citation], they too are subject to the sovereign's right to extend, withdraw or modify the powers delegated." (*Id.* at p. 6.) It is this "legislative control over cities and counties" that animates the rule that "subordinate political entities, as 'creatures' of the state, may not challenge state action as violating the entities' rights under the due process or equal protection clauses of the Fourteenth Amendment or under the contract clause of the federal Constitution. 'A municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the federal constitution which it may invoke in opposition to the will of its creator.' " (*Ibid.*)

The dictum in *Star-Kist* on which the trial court relied has no application in the present case. It has long been recognized that "[a] municipal corporation, created by a state for the better ordering of government, has no privileges or immunities under the Federal Constitution which it may invoke in opposition to the will of its creator." (*Williams v. Baltimore* (1933) 289 U.S. 40, 53; see 13 C. Wright, A. Miller, & E. Cooper, Fed. Practice and Proc. (1975) § 3531, p. 234 ["Political subdivisions of states have been held to lack constitutional rights against the creating state, a conclusion that is at times translated into a lack of standing to challenge state policies."].) But the Water Authority

---

[24] Certain constitutional rights, like the "guarantees that all citizens enjoy equal protection of the laws and due process of law . . . are not structural limitations on government power in the Supremacy Clause sense, but they are rights given to individual citizens which limit governmental power generally. Such rights accrue to individual citizens, not to units of government." (*San Diego Unified Port Dist. v. Gianturco* (S.D. Cal. 1978) 457 F.Supp. 283, 290.)

does not seek to invoke privileges "in opposition to the will of its creator" but to a co-equal public agency. It is not asserting any right against the state that has created it. Suits between public agencies are hardly uncommon. Although there assuredly is a "long line of cases which hold that a public entity, being a creature of the state, is not a 'person' within the meaning of the due process clause, and is not entitled to due process from the state" (*Santa Monica Community College Dist. v. Public Employment Relations Bd.* (1980) 112 Cal.App.3d 684, 690), the Water Authority is not asserting a right to due process of law, or equal protection of the law, rights that understandably are principally for the benefit of natural persons. The right to petition the courts for redress of unlawful acts, in contrast, is not inherently a right applicable only to natural persons. The California Constitution confers on public agencies a multitude of rights and powers, many of which undoubtedly would become meaningless if the agencies were powerless to enforce them. It is no stretch to find inherent in these rights and powers constitutional recognition of the right to petition the courts for protection of the agencies' legal rights.

*Star-Kist* pointed out that one reason for recognizing the standing of the public agencies in that case was that there was "a real possibility that the constitutionality of the Legislature's scheme . . . would have gone unchecked absent challenge by those entities charged with administration of the program." (*Star-Kist, supra,* 42 Cal.3d at p. 9.) Similarly here, if the Water Authority—an intermediary in the delivery chain of water to the ultimate consumer—cannot challenge the rates charged by Metropolitan, any unlawful rates that Metropolitan may charge undoubtedly would go unchecked. In a case such as this one, the right to petition, if successfully asserted, will indirectly inure to the benefit of the natural persons who ultimately purchase the water to which Metropolitan's rates apply. Sound public policy thus militates strongly in favor of recognizing the constitutional basis for the water agency's statutory right (Gov. Code, § 945) to seek judicial relief. As the Ninth Circuit has stated in holding that the First Amendment right to petition protects government actors, "[t]his kind of petitioning may be nearly as vital to the functioning of a modern representative democracy as petitioning that originates with private citizens." (*Manistee Town Center v. City of Glendale, supra,* 227 F.3d at p. 1093;

44

see also *Mariana v. Fisher* (3d Cir. 2003) 338 F.3d 189, 200 ["Governmental petitioning is as crucial to the modern democracy as is that of private citizens."].)

Because the Water Authority is entitled to judgment on its declaratory relief cause of action declaring the RSI clause invalid and unenforceable as an unconstitutional condition, we need not address other possible grounds for striking the offensive provision. We need not decide whether the provision, although admittedly included in the water conservation program contracts with the "object, directly or indirectly" of insulating Metropolitan from suits for the violation of law, does not run afoul of Civil Code section 1668 because it does not "exempt" it from liability,[25] or whether the provision violates broader principles of unconscionability and public policy.

B. Attorney fees

The trial court found the Water Authority to be the prevailing party in the litigation and awarded it attorney fees of almost $9 million pursuant to a contractual fee provision contained in the parties' amended exchange agreement. (Civ. Code, § 1717.) The award represents fees incurred through phase one of trial. The Water Authority asserts the trial court misconstrued the scope of the agreement's attorney fee provision in denying it an additional $2.6 million for prosecuting the second phase of trial.

Reversal of the judgment will necessitate a redetermination of the prevailing party on remand, as the Water Authority is no longer the possessor of a "simple, unqualified win." (*Hsu v. Abbara* (1995) 9 Cal.4th 863, 876.) On remand, the trial court must determine if one of the parties "recovered a greater relief in the action on the contract" than the other (Civ. Code, § 1717, subd. (b)(1)) or if the results of the litigation are sufficiently mixed that no party may be said to have prevailed. (*Hsu, supra,* at pp. 874-876.) While the prevailing party determination may change, the scope of the contractual fee provision remains relevant and requires our consideration.

---

[25] Civil Code section 1668 provides: "All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for its own fraud, willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law."

45

The provision states, in relevant part, that no party shall seek to modify conveyance charges set under the agreement for a period of five years from its execution but that after the expiration of that time period, "nothing herein shall preclude [the Water Authority] from contesting in an administrative or judicial forum whether such charge or charges have been set in accordance with applicable law and regulation . . . . In the event that [the Water Authority] contests a matter pursuant to the foregoing sentence, the prevailing party shall be entitled to recovery of reasonable costs and attorney fees incurred in prosecuting or defending against such contest."

In denying the Water Authority's request for attorney fees incurred in the second phase of trial, the court found: "The fees clause here is highly idiosyncratic; it is not a general 'prevailing party' clause. It is narrowly drafted to cover attorneys' fees in cases challenging rates." The court determined the prevailing party "may only recover attorneys' fees for phase I of the case, which dealt specifically with rates," and not for phase II, which addressed whether Metropolitan breached the contract. Where, as here, interpretation of a contract "does not turn on the credibility of conflicting extrinsic evidence, the trial court's interpretation of the contract is a question of law we review de novo, or independently." (*Tribeca Companies, LLC v. First American Title Ins Co.* (2015) 239 Cal.App.4th 1088, 1110.)

We see no basis for denying fees incurred in the second phase of trial on the breach of contract claim. We agree with the trial court that the fee clause does not broadly cover all contract actions but is narrowly drafted to cover only claims challenging the rates charged by Metropolitan. We disagree, however, that the breach of contract claim here is not such a claim. The contract claim, like the claims tried in phase one, is founded on the assertion that Metropolitan's charges are unlawfully set. Section 5.2 of the water exchange agreement requires water transportation rates—the contract's price term—be "set in accordance with applicable law and regulation," permits the Water Authority to contest the lawfulness of those rates, and entitles the prevailing party to recover attorney fees incurred in prosecuting "such contest." The Water Authority's breach of contract claim is founded on this contractual provision. In the operative

46

complaint, the Water Authority alleges Metropolitan "breached section 5.2 by setting rates for the conveyance of the Water Authority's purchased water that violate applicable laws and regulations." The contract price and water rates are one and the same. Proving breach of the price term necessarily includes a rate challenge.

The lawfulness of the charges imposed under the exchange agreement was not an issue confined to phase one. Metropolitan asserted throughout trial that its contractual charges were set in accordance with applicable law and regulation. In phase two Metropolitan argued there was no breach of contract because the parties understood charges set pursuant to "applicable law and regulation" included the State Water Project costs and water stewardship rate components, even if the components were invalid as applied to third parties. Both phases of trial thus concerned a dispute over whether charges in the exchange agreement were "set in accordance with applicable law and regulation." The prevailing party in that contest, as determined by the trial court on remand, is entitled to an award of contractual attorney fees.

We note, however, that neither the statutory preferential rights claim tried in phase two, nor the unconstitutional condition issue determined on summary judgment, are within the scope of the attorney fee clause. We leave to the trial court the task of appropriate allocation should this become necessary.

## Disposition

The judgment is reversed and the peremptory writ of mandate vacated. The matter is remanded to the trial court for recalculation of damages, entry of declaratory

relief on the Rate Structure Integrity clause, redetermination of the prevailing party, and other proceedings consistent with the views expressed in this opinion. The parties shall bear their respective costs and attorney fees incurred on the appeal and cross-appeal.

_____
Pollak, J.

We concur:


_____
McGuiness, P. J.


_____
Siggins, J.

SIGGINS, J., Concurring.

I join fully in Justice Pollak's opinion for the court, and write separately to express an additional reason why I believe the Rate Structure Integrity (RSI) provision in the contract between Metropolitan Water District of Southern California (Metropolitan) and the San Diego County Water Authority (Water Authority) is invalid. I believe it is unconstitutional for a different reason than the effect it may have on the right to petition for redress of grievances. In my view, it is inconsistent with the constitutional requirement that water rates be set in the manner prescribed by law because it seeks to evade the statutory scheme that governs the joint use of capacity in water conveyance facilities set forth in the wheeling statutes at division 2, article 4 of the Water Code (§§ 1810-1814). I would conclude it is unenforceable for this reason.

Our state Constitution provides that: "The right to collect rates or compensation for the use of water supplied to any county, city and county, town, or the inhabitants thereof, is a franchise, and cannot be exercised except by authority of and in the manner prescribed by law." (Cal. Const., art. X, § 6.)

The wheeling statutes provide a basis for the Water Authority to use Metropolitan's conveyance facilities upon the payment of fair compensation. (Wat. Code, § 1810.) But those statutes also make clear that "any determination made under this article" can be the subject of a judicial challenge in which "the court shall consider all relevant evidence, and the court shall give due consideration to the purposes and policies of this article." (Wat. Code, § 1813.) Because the RSI conditions the provision of wheeling services under the exchange agreement on the waiver of any judicial remedy for violation of the wheeling statutes, and in fact seeks to insulate Metropolitan's rates from judicial review, I believe it is invalid under application of *Parrish v. Civil Service Commission* (1967) 66 Cal.2d 260, 271 for reasons expressed by the trial court in its summary judgment ruling and Justice Pollak in his majority opinion.

_____

Siggins, J.

1

| | |
|---|---|
| Trial court: | San Francisco County Superior Court |
| Trial judge: | Honorable Richard A. Kramer<br>Curtis E.A. Karnow |
| Counsel for Plaintiff and Appellant Metropolitan Water District of Southern California: | QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>John B. Quinn<br>Eric J. Emanuel<br>Valerie Roddy<br><br>MORGAN LEWIS & BOCKIUS LLP<br>Colin C. West<br>Thomas S. Hixson<br><br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>Kathleen M. Sullivan<br><br>THE METROPOLITAN WATER DISTRICT OF SOUTHERN CALIFORNIA<br>Marcia Scully<br>Heather C. Beatty<br>Joseph Vanderhorst<br>John D. Schlotterbeck |
| The City of Los Angeles acting by and through the Los Angeles Department of Water and Power: | Michael N. Feuer, City Attorney<br>Joseph A. Brajevich, General Counsel<br>Julie C. Riley, Deputy City<br>Melanie Tory, Deputy City Attorney<br><br>MEYERS, NAVE, RIBACK, SILVER & WILSON<br>Amrit S. Kulkarni<br>Gregory J. Newmark |
| Municipal Water District of Orange County: | ALESHIRE & WYNDER, LLP<br>Stephen R. Onstot |
| City of Torrance: | John L. Fellows III, CITY ATTORNEY<br>Patrick Q. Sullivan, ASSISTANT CITY ATTORNEY |

1

| | |
|---|---|
| Las Virgenes Municipal Water District, Eastern Municipal Water District, Western Municipal Water District, Foothill Municipal Water District, and West Basin Municipal Water District: | LEMIEUX & O'NEILL<br>Steven P. O'Neill<br>Michael Silander |
| Three Valleys Municipal Water District: | BRUNICK, MCELHANEY & KENNEDY<br>Steven M. Kennedy |
| Counsel for amicus curiae Upper San Gabriel Valley Municipal Water District: | LEMIEUX & O'NEILL<br>Steven P. O'Neill |
| Counsel for Defendants and Appellants San Diego County Water Authority: | KEKER, VAN NEST & Peters LLP<br>John W. Keker<br>Daniel Purcell<br>Dan Jackson<br>Warren A. Braunig<br><br>SAN DIEGO COUNTY WATER AUTHORITY<br>Mark J. Hattam |